United States District Court
Southern District of Texas
**ENTERED**
September 21, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMERICAN AUTOMOBILE ASSOCIATION, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-04425 |
| | § | |
| SAGA INTERNATIONAL, INC., | § | |
| | § | |
| Defendant. | § | |

**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER OF PERMANENT INJUNCTION**

On December 8, 2025, the Court, in its Order granting partial summary judgment and concluded that Defendant Saga International, Inc., which does business as AAAA Auto Insurance and AAAA Insurance, is liable for infringement of trademarks of Plaintiff, the American Automobile Association, Inc. or AAA. *See* Order Granting Summary Judgment for Plaintiff and Dismissing Defendant's Counterclaims, Dkt. No. 55; *Am. Auto. Ass'n, Inc. v. Saga Int'l, Inc.*, 832 F. Supp. 3d 701 (S.D. Tex. 2025). In that order, the Court deferred all remedies issues — including the scope of any permanent injunction — to a later phase of litigation. On June 25, 2026, the Court held a bench trial, at which it heard testimony of the parties, received documentary evidence, and heard arguments of counsel on remedies. Upon careful consideration of the testimony and evidence presented, the Court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

1. Plaintiff AAA is a non-profit corporation founded in 1902 known for providing automotive-related goods and services. Plaintiff owns more than 150 active federal trademark registrations, including AAA (Reg. No. 829,265, issued May 23, 1967), and AAA LIFE INSURANCE COMPANY (Reg. No. 1,101,726, issued Sept. 5, 1978) ("AAA Marks"). Plaintiff's federal

registrations for the AAA Marks have become incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065, and under 15 U.S.C. § 1115(b), they constitute conclusive evidence of AAA's exclusive right to use the AAA Marks in connection with insurance services.

2. Plaintiff is the owner of, among others, the following U.S. trademark registrations which comprise the marks-in-suit:

| Reg. No. | Mark | Class / Goods and Services |
|---|---|---|
| 829,265 | AAA | Cl. 35: placing insurance with underwriters;<br>Cl. 37: emergency roadside service. |
| 1,101,726 | AAA LIFE INSURANCE COMPANY | Cl. 36: underwriting of life and accident insurance. |
| 2,158,654 | | Cl. 36: adjusting and collecting insurance damage claims, insurance brokerage services, namely, obtaining insurance, placing insurance with underwriters;<br>Cl. 37: emergency roadside service. |
| 2,935,481 | Premier | Cl. 36: reimbursement of rental car expenses, trip interruption and vehicle return service, travel accident insurance underwriting services;<br>Cl. 37: emergency roadside service |
| 5,036,379 | | Cl. 36: adjusting and collecting insurance damage claims, insurance brokerage services, namely, obtaining insurance with underwriters;<br>Cl. 37: emergency roadside repair service. |

3. Plaintiff provides insurance, roadside assistance, and other automotive products and services to 60 million members nationwide through its network of regional member clubs.

4. Plaintiff has invested "millions and millions of dollars over the years" on advertising and promotion to build up AAA's goodwill using the AAA Marks. Plaintiff uses the AAA Marks in, among other channels, print media, storefront signage, websites, social media platforms, search engines, and online maps.

5. Plaintiff has used its primary AAA Mark to identify its insurance and roadside services and to distinguish them from those of unaffiliated providers for over a century.

6. AAA does not have individual members, nor does it offer relevant insurance products or services to individuals. Plaintiff licenses the AAA Marks to constituent member clubs for the provision of auto insurance, home insurance, renter insurance, boat insurance, and commercial insurance.

7. The constituent member clubs have individual members in each club's respective geographic area. In turn, each club's members pay the respective club an annual membership fee, and AAA then receives $0.10 per individual member per year from each of its member clubs. AAA does not receive any additional payments if a member club sells additional products or services to its members, including insurance products. AAA is not licensed to sell and does not broker the sale of insurance in the State of Texas.

8. AAA's member club covering Texas is Auto Club Enterprises ("ACE"). ACE provides insurance underwriting services through subsidiaries.

9. ACE sells memberships to individuals. An ACE/AAA membership costs $59.00 per year and entitles members to roadside assistance services from ACE. Members also become eligible to purchase insurance from ACE if they choose to do so and if they otherwise meet ACE's underwriting standards. ACE directly underwrites insurance for its members who elect and qualify for insurance. ACE does not broker insurance underwritten by others

10. While a consumer does not need to be a member of ACE/AAA to obtain an insurance quote, membership in ACE/AAA is a prerequisite to obtain roadside assistance and purchasing insurance. Thus, a consumer who does not first purchase an annual $59.00 membership from ACE/AAA cannot purchase insurance from ACE.

11. Ahmed Ali began operating Saga International, Inc. in 1995. Since that time, Saga has done business as "AAAA Auto Insurance" or "AAAA Insurance." Saga asserts it chose this name

both as a tribute to Ahmed's and his children's initials, which all begin with the letter "A", and to ensure a favorable placement in alphabetical listing directories such as the Yellow Pages.

12. Ali formed Saga after identifying who he referred to in trial as "low-income Hispanics" as an underserved community that had demand for no-frills auto insurance but few companies from which to buy such insurance. Saga began operations in Houston, Texas. It eventually expanded to Dallas, El Paso, San Antonio, and Austin, but it currently only operates in Houston. Saga only brokers insurance through third party carriers; it does not directly underwrite insurance.

13. Saga locates its offices in lower-income neighborhoods with large Hispanic populations. This is done to make it easy for its customer base to walk or take the bus to Saga's stores, as Saga's customers often do not have driver licenses and/or insurance coverage at the time they purchase insurance from Saga. Saga has appeared in the Yellow Pages since at least 2000 and online since at least 2007. In addition, Saga advertises near its storefronts through flyers and advertisements in local community periodicals such as *Greensheet* or the Spanish-language *Buena Suerte*. Saga also uses colorful, highly-visible storefronts to attract customers. Fifty to sixty percent of Saga's customers are walk-ins at storefronts, and another thirty-five percent purchase insurance over the phone.

14. Saga uses the following logo (the "Saga Logo") in advertising and on its webpage:

15. Saga's relevant name has also appeared in the following ways on its website, email, and storefronts:

| AAAA Marks |
| --- |
| AAAA Insurance |
| Contact AAA Auto Insurance today<br>options and costs. At AAA Auto Insurance, we provide accurate and helpful information and personalized auto insurance quotes. |
| AAAA Insurance has built their reputation upon providing each customer with excellent and friendly service. |
| AAAA Insurance |
| AAAA INSURANCE |
| AAAA AUTO INSURANCE |
| AAAAINS.COM |
| INFO@AAAAINS.COM |

16. Saga has high customer turnover because its customers often only purchase insurance a month at a time in order to meet minimum legal requirements, such as establishing required minimum liability coverage to comply with Texas law, without keeping long-term coverage. Sixty to seventy percent of Saga's customers are otherwise uninsurable due to lack of a driver license, and those with licenses have other attributes barring them from traditional insurance such as poor driving records, DWI convictions, or poor credit scores. There is no evidence in the record that a majority of ACE's members in Texas share any of these same attributes. There is no evidence in the record that AAA/ACE has any storefronts in Houston that are geographically near to any Saga storefronts.

17. Because of poor driving records, bad credit, lack of a driver license, or immigration status, Saga's customers thus often use non-standard insurance brokers who specifically cater to difficult-to-insure customers. Some of Saga's affiliated carriers also sell roadside assistance as an add-on to coverage, but Saga has never sold standalone roadside assistance. Indeed, Saga's customers almost always purchase the cheapest available option without add-ons such as roadside assistance. Out of over 3,000 current customers, Saga could only identify 5 who purchased roadside assistance.

18. AAA's and Saga's businesses models are different. AAA affiliates use roadside assistance customers as a pipeline to potential insurance customers for whom the affiliate then directly underwrites policies. Saga relies on walk-in customers who learned of Saga through word of mouth or local advertising, and Saga then brokers insurance for those customers amongst several underwriters to get the best fit with the best price.

19. As part of an unrelated dispute over the ownership and control of Saga, non-party Shahil Rais attempted to trademark "AAAA" for himself. In response, Saga applied for the same trademark in its own name in 2022. The United States Patent and Trademark Office ("USPTO") refused registration based on a likelihood of confusion with Plaintiff's prior-registered marks. However when the dispute with Rais was resolved, and Saga withdrew its filings.

20. Plaintiff has never authorized Defendant to use the AAA Marks or any similar designation. Nonetheless, Defendant has, on at least two occasions, referred to itself as "AAA" and "AAA Auto Insurance" on its website. Otherwise, it uses the names and marks "AAAA," "AAAA Insurance," and "AAAA Auto Insurance" across its website, social media, marketing materials, and storefront signage. On June 8 and September 13, 2022, Plaintiff sent Defendant notice letters, requesting that Defendant withdraw its applications and stop using the AAAA Marks. Plaintiff then sent seven additional written communications attempting to resolve the matter.

21. Ahmed Ali testified that Saga was not aware of these two uses of AAA on Saga's website prior to this lawsuit. AAA also did not mention these uses of the "AAA" mark in any of its demand letters. When AAA disclosed the improper usage in its petition, Saga asked for AAA to specify where on the website "AAA" was used so that Saga could remove the uses. AAA did not provide this information, and Saga engaged a vendor to scour the website and locate the misuse. Saga removed the "AAA" typographical errors within twenty-four hours of finding them. However, Saga has continued to use its "AAAA" name.

## II. Conclusions of Law

Because the Court found infringement under the Lanham Act on summary judgment, the Court did not reach AAA's Texas common law trademark infringement or unfair competition claims. These share the same elements and remedies as Lanham Act claims. *See Beauty Elite Grp. v. Palchick*, 2008 WL 706601, at *1 n.2 (Tex. App.— Houston [14th Dist.] 2008, no pet.) ("The contours of a trademark infringement action under Texas common law track those of a federal trademark infringement action."). All relief provided for herein is pursuant to both the Lanham Act and Texas common law.

### 1) Infringement

The Court found liability for Saga under the Lanham Act on summary judgment, but the Court did not specify which particular act(s) by Saga constituted infringement. The Court clarifies that Saga's use of the letters "AAA" on its website literally infringed AAA's marks. The Court further clarifies that the name "AAAA" also presented a likelihood of confusion when *combined* with the infringing use of "AAA" on the website. Because the Court found that Saga violated the Lanham Act, AAA may be entitled to damages, disgorgement, costs, and attorneys' fees.

### 1) Remedies

**a) Disgorgement**

Disgorgement of a defendant's profits is within the discretion of the Court and centers around the following so-called "*Pebble Beach* factors": (1) whether the defendant intended to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting her rights; (5) the public interest in making the conduct unprofitable; and (6) whether it is a case of palming off. *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998). "[A]n award of profits with no proof of harm is an uncommon remedy . . . ." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 883 (5th Cir. 2019). Indeed, "[d]isgorgement of profits is appropriate only if it is equitable and the defendant's profits are *attributable* to the Lanham Act violation." *Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512 (5th Cir. 2020) (emphasis added). For that reason, "a plaintiff who cannot demonstrate diversion or palming off faces an uphill battle in obtaining disgorgement." *Retractable Techs.*, 919 F.3d at 882.

The first factor slightly favors disgorgement. Although this Court is unconvinced that Defendant's use of Plaintiff's mark was overtly intentional, the Court found at summary judgment that, at the very least, the "Defendant acted at its own risk in *continuing* to use the [AAAA] designation after receiving notice of Plaintiff's service mark rights and registrations." Dkt. No. 55, at p.17. The Fifth Circuit has held that willfulness is not a prerequisite for disgorgement. *See Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 347 (5th Cir. 2002). However, the converse is not true—proving willfulness does not entitle plaintiffs to disgorgement. In fact, as one court in this circuit has affirmed, "disgorgement is often denied in willful false advertising and deliberate infringement cases where there is no proof of diversion or palming off." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 2017 WL 11638413, at *12 (E.D. Tex. Aug. 17, 2017), *aff'd*, 919 F.3d 869 (5th Cir. 2019) (citing *Tex. Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.*, 951 F.2d

684, 695 (5th Cir. 1992); *Sw. Recreational Indus., Inc. v. FieldTurf, Inc.*, 2002 WL 32783971, at *9 (5th Cir. Aug. 13, 2002)).

The second factor does not favor disgorgement. Although in cases with limited evidence of diversion a court may limit the recovery period to the time after which a defendant's conduct became willful, "[s]peculative and attenuated evidence of diversion of sales will not suffice." *Retractable Techs.*, 842 F.3d at 901 (citing *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 & n.8 (5th Cir. 2000)). Here, AAA did not put forward any actual evidence of diverted sales, nor did it put forward any evidence of a decline in or loss of sales. The Court thus cannot infer that any sales were diverted.

The third factor weighs against disgorgement. The Fifth Circuit has determined that "the goal behind [the Lanham Act] remedies is to achieve equity between or among the parties." *Seatrax*, 200 F.3d at 369. The Fifth Circuit and district courts in this circuit often find injunctive relief alone adequate in Lanham Act cases, particularly where plaintiffs have not proven any lost or diverted sales. *See Retractable Techs.*, 2017 WL 11638413, at *14 (collecting cases). While disgorgement may be appropriate to compensate for any unjust enrichment, here an injunction mandating a corrective disclaimer and name restriction amount to injunctive relief that achieves equity among the parties.

The fourth factor does not favor disgorgement. Here, it is true that Plaintiff acted essentially immediately in asserting its trademark rights against Defendant. As found by the Court at summary judgment, there is "no evidence of Plaintiff's actual knowledge of AAAA before 2022." Dkt. No. 55 at 23. Despite this, the Court finds it highly significant that Saga openly used the "AAAA" name in business and in extensive advertising since the 1990s. Furthermore, AAA did not retain and/or did not locate any MarkMonitor reports (or similar reports from a prior vendor) before 2020. AAA did not provide any testimony of what was known by AAA prior to 2020, because its

only witness (Douglas Kelly) had no personal knowledge of events prior to his start of work with AAA in 2020. Indeed, Kelly acknowledged that it is possible that AAA was aware of Saga's use of the "AAAA" name before 2020. The Court thus concludes that AAA did not meet its burden of establishing a lack of delay.

The fifth factor weighs in favor of disgorgement. "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *6 (E.D. Tex. Sept. 22, 2025). Furthermore, courts in this Circuit have consistently recognized the "strong public interest" in deterring infringement. *See, e.g.*, *Pengu Swim Sch., LLC v. Blue Legend, LLC*, 2023 WL 5598996, at *8 (S.D. Tex. Aug. 29, 2023) ("[T]here is a strong public interest in deterring infringement."); *Gibson*, 2025 WL 2698115, at *6 ("[T]he public generally benefits from aggressive competition in the market place among non-infringing products."). Because this case is no different, this factor weighs in favor of disgorgement.

The sixth factor does not favor disgorgement. Because this case does not involve palming off, this non-mandatory factor "does not apply." *See Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, 2020 WL 598284 (S.D. Tex. Feb. 7, 2020), *amended in part*, 2020 WL 3525485 (S.D. Tex. Apr. 21, 2020).

Considering the foregoing, the Court finds an award of disgorgement of profits inappropriate because three *Pebble Beach* factors, including the two most important, weigh against awarding disgorgement, and only two weigh in favor of disgorgement, one of which only slightly.

**b) Injunction**

Both parties agree that some form of injunction is warranted here. Regardless, an injunction is "not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quotation omitted). The

party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

First, Plaintiff has suffered irreparable harm. Because Defendant has been found liable for infringement, Plaintiff is entitled to a presumption that it has suffered irreparable harm from that infringement. 15 U.S.C. § 1116; *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:2 (4th ed. 2001) ("All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion – injury is presumed.").

Second, money damages are inadequate to compensate Plaintiff for Defendant's infringement of its AAA Marks. "[T]here seems little doubt that money damages are 'inadequate' to compensate [owner] for continuing acts of [infringer]." *Alpha Chi Omega*, 708 F.3d at 627 (quoting 5 MCCARTHY ON TRADEMARKS, *supra*). This is because the damage caused by a plaintiff's loss of control over the products being associated with its mark cannot not easily be quantified. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

Third, the balance of hardships weighs in favor of a permanent injunction: "Courts in this Circuit have found that the balance of hardships weighs in favor of granting an injunction where the movant has presented evidence that it has invested considerable time, effort, and expense in promoting a mark." *EKF Diagnostics Inc. v. Intermountain Biomedical Servs. Inc.*, 2018 WL 3603070, at *13 (W.D. Tex. June 18, 2018). Plaintiff has made this showing. *See supra* at ¶¶ 4–5 (summarizing investment in AAA Marks). Without an injunction, Plaintiff "would be unable to protect its brand name and reputation." *See Lewis Brisbois Bisgaard & Smith LLP v. Bitgood*, 2024

WL 3826416, at *7 (S.D. Tex. Aug. 14, 2024), *aff'd in relevant part, vacated in part, remanded*, 2025 WL 2987446 (5th Cir. Oct. 23, 2025). Plaintiff would instead be forced into a position of needing to continue to litigate cases to prevent future infringement. *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 2025 WL 2698115, at *5 (E.D. Tex. Sept. 22, 2025). On the other hand, imposing an injunction merely requires bringing Defendant "back into compliance with the law." *Coach, Inc. v. JoJo Handbags*, 2012 WL 13042944, at *10 (S.D. Tex. May 11, 2012).

Fourth, the public interest is served by granting injunctive relief because an injunction will "protect[] the public from confusion or deception as to the nature and source of goods." *Gibson*, 2025 WL 2698115, at *6. Because "[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks," this factor is also satisfied. *Id*.

For the above reasons, then, the Court finds a permanent injunction to be warranted.

***i) Scope of the Injunction***

The Lanham Act "endows the district court with considerable discretion in fashioning an appropriate remedy for infringement." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992). "In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Id*. at 1126 (internal quotations and citation omitted); *see also Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. Unit A 1981) (defendant required to distance itself from plaintiff's trade dress, even if requirement involves a competitive handicap not suffered by others); *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 650–51 (6th Cir.) (affirming district court's requirement of corrective advertising).

Both parties agree an injunction would necessarily restrict Defendant from incorporating any AAA Mark, including the designation "AAA," as well as incorporating any ellipse design resembling that used by AAA in its AAA mark. Plaintiff, however, proposes further restrictions which include prohibiting Defendant from "incorporating as an element the letter A repeated adjacently and sequentially from two to seven times (e.g., AA INSURANCE, AAA INSURANCE, AAAA INSURANCE, and so on through AAAAAAA INSURANCE)." Plaintiff also strongly objects to the sufficiency of Defendant applying a disclaimer to its website and commercial storefronts.

Regarding a restriction on incorporated an adjacently repeated letter A, the Court finds this restriction to be slightly overbroad. Considering the Court's clarification that the name "AAAA" presented a likelihood of confusion when *combined* with the infringing use of "AAA" on the website, this restriction would be unnecessarily burdensome; indeed, Plaintiff's unexplained decision to allow eight letter A's to be used in sequence, but not, for example, seven letter A's, appears to be arbitrary. Equitable "relief granted should be no broader than necessary to cure the effects of the harm caused." *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (quoting *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987)). The Court thus declines to adopt this feature of the proposed injunction.

Regarding a proposed disclaimer, the district courts have a responsibility to tailor the relief to the violation, a responsibility that includes consideration of the use of a disclaimer. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 673 (5th Cir. 2000) (remanding case to determine if "a limited injunction containing disclaimer relief could be an effective remedy"). Disclaimers that emphasize the source of a product or services or that disclaim affiliation can reduce or eliminate a minimal likelihood of confusion. *Pebble Beach Co., Resorts of Pinehurst, Inc. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1550 (S.D. Tex. 1996), *aff'd as modified by*, 155 F.3d 526 (5th Cir.

1998) (internal citations omitted). But the use of "an obscure or inconspicuous disclaimer will not be sufficient to reduce confusion." *Id*.

Plaintiff argues that Defendant bore a strict burden to show via objective evidence that a disclaimer would significantly reduce the likelihood of consumer confusion, which Defendant did not meet; Plaintiff also argues that disclaimers are generally only allowed "where First Amendment interests in protecting 'expressive' content counsel against an outright ban." Dkt. No. 91, at p.26 (quoting *Trojan Battery Co., LLC v. Trojan EV, LLC*, No. 4:21-CV-3075, 2024 WL 1331783 (S.D. Tex. Mar. 28, 2024), *aff'd in part, vacated in part, remanded sub nom. Trojan Battery Co., L.L.C. v. Golf Carts of Cypress, L.L.C*, 175 F.4th 582 (5th Cir. 2026)). The Fifth Circuit has not ruled on the scope of a disclaimer's burden of proof, nor on which party it sits, and not every court in this circuit has placed that burden on the Defendant. *See Gruma Corp. v. Mexican Restaurants, Inc.*, 2013 WL 12134147, at *15 (E.D. Tex. Sept. 27, 2013) (asking whether the Plaintiff has provided evidence to prove initial-interest confusion). Moreover, the Court agrees that "[i] there is a clear and prominent disclaimer or full disclosure to the first buyer of the product, there will probably be no point-of-sale confusion." *Id*. at *14 (quoting 4 MCCARTHY ON TRADEMARKS, *supra* at § 23.5). Otherwise, "courts have used disclaimers in fashioning an injunctive relief even when there were no First Amendment concerns." *Id*. (citing *Pebble Beach Co.*, 155 F.3d at 552; *Roho*, 902 F.2d at 361).

For those reasons, the Court finds that AAA is entitled to a permanent injunction which includes a disclaimer but does not restrict Defendant's use of its AAAA name. The Court will set forth the complete terms of the injunction in its conclusion below.

**c) Attorneys' Fees**

Attorneys' fees are only available under the Lanham Act in "exceptional cases." 15 U.S.C. § 1117(a). "An award of attorneys' fees under § 1117(a) generally requires a showing of a high

degree of culpability on the part of the infringer, for example, bad faith or fraud." *Pebble Beach Co.*,155 F.3d at 556. As such, "a district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense[.]" *Id*. "Additionally, lack of damages is an important factor in determining whether a case is exceptional." *Id*.

The Court may deem a case exceptional if "(1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an "unreasonable manner." *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016). "A case will not qualify as exceptional under the Lanham Act merely because one side has zealously pursued or defended its claim, especially on an issue with no directly controlling precedent." *Tobinick v. Novella*, 884 F.3d 1110, 1119 (11th Cir. 2018). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

The Court does not find that, considering the facts and the law of this case, that it stands out in any particular way in regards to the strength of the Plaintiff's position. Rather, considering the length of time Defendant operated under the AAAA Auto Insurance name, as well as the ubiquity of business names with repeating letters, this case is closer to simply a good faith difference of opinion about whether "AAA" and "AAAA" are inherently and inexorably conflicting.

Furthermore, the Court must only consider "subjective bad faith or exceptionally meritless claims" to award fees. *Stragent, LLC v. Intel Corp.*, 2014 WL 6756304, at *3 (E.D. Tex. Aug. 6, 2014). This does not include counsel's "mistaken legal interpretation or conclusion" as "[t]o order attorneys' fees predicated upon such a mistake would be a poor precedent to set that would permit courts to punish future litigants for advancing arguments that are not infallible." *True Believers*

*Ink 2, Corp. v. Russell Brands, LLC*, 2020 WL 2113600, at *15 (E.D. Tex. May 4, 2020). Further, "the mere fact that the losing party made a losing argument is not a relevant consideration; rather, the focus must be on arguments that were frivolous or made in bad faith." *Stragent, LLC*, 2014 WL 6756304, at *4. The Court does not find that this case has been litigated by Saga in an unreasonable manner such that fees would be warranted here.

**d) Costs**

A prevailing Lanham Act plaintiff is entitled, "subject to the principles of equity, to recover . . . the costs of the action." 15 U.S.C. § 1117(a). The prevailing party is the "party in whose favor a judgment is rendered, regardless of the damages awarded." Gibson, 2025 WL 2698115, at *8. Plaintiff provided evidence of its costs of $2,887.38 as follows:

a. $2,347.38 – court reporter fees for deposition transcript services;

b. $405.00 – complaint filing fee; and

c. $135.00 – fee for service of process on Defendant.

Plaintiff's claimed fees are appropriately taxed as costs against Defendant under 28 U.S.C. § 1920(1) (fees of the clerk) or § 1920(2) (transcript fees). Plaintiff is entitled to its costs of $2,887.38.

## Conclusion and Order

For the foregoing reasons, the Court orders that Plaintiff is entitled to a permanent injunction against Defendant; Defendant is enjoined from using any trademark, service mark, logo, trade name, corporate name, assumed name, domain name, or any other name or symbol associated with Plaintiff's business, including:

(a) incorporating any AAA Mark, including the designation "AAA";

(b) incorporating any ellipse design resembling that used by AAA in its AAA mark reflected in Reg. No. 5,036,379; or

(c) any other wording or design element, either alone or in conjunction with words or symbols, that is confusingly or deceptively similar to, or would tend to identify Defendant or its goods and services with, Plaintiff or the AAA Marks, logos, or trade names.

Additionally, the Court orders Defendant Saga to, within thirty (30) days of entry of judgment, place a prominent disclaimer on its website and storefronts stating "Not affiliated with the American Automobile Association (AAA)."

Finally, the Court concludes that Plaintiff is entitled to recover from Defendant Plaintiff's costs of court in the amount of $2,887.37.

SO ORDERED September 21, 2026, at McAllen, Texas.

Randy Crane
Chief United States District Judge